FILED
NOV 0 6 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEAN PHILIP HARRIS,

             Plaintiff,

     v.

DR. VARGO; HARDY MYERS;
DR. STEVE SHELTON; DR. GARTH
GULICK; JOHN AND JANE DOES,

             Defendants.

CV-07-1654-ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Dean Philip Harris ("Harris"), appearing *pro se*, is an inmate in the custody of

the Oregon Department of Corrections ("ODOC") and currently housed at the Oregon State

Penitentiary ("OSP"). Harris brings this civil rights action pursuant to 42 USC § 1983 against

Hardy Myers ("Myers"), the former Attorney General of Oregon, and various members of ODOC

Replace
65

medical staff who were involved in his medical care and treatment. Harris filed this suit on November 2, 2007, as a petition for writ of habeas corpus. On February 8, 2008, in response to the court's Order to Show Cause, Harris filed an amended civil rights complaint, alleging that defendants were deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment rights, by failing to pursue options to alleviate his back pain.

Defendants have filed a Motion for Summary Judgment (docket #48). In response, Harris filed a Motion for Summary Judgment (docket #57) with various attachments and a brief response to defendants' motion (docket #61). For the reasons set forth below, defendants' motion should be granted, and Harris' motion should be denied.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* (citation omitted).

While courts should generally provide notice to *pro se* litigants regarding the procedural requirements for a summary judgment motion, the court may take judicial notice of its own records, showing that "the plaintiff had recently been served with [the required] notice in prior litigation." *Rand v. Rowland*, 154 F3d 952, 961-62 (9th Cir 1998).

## FACTS

Harris, proceeding *pro se*, has filed previous suits in this court centering upon various aspects of his medical treatment while in ODOC custody. *Harris v. Spriet, et. al.*, Civil No. 06-894-BR; *Harris v. Duncan, et. al.*, Civil No. 07-806-ST. Accordingly, this court has instructed Harris twice on the requirements of the Local Rules and the Federal Rules of Civil Procedure. Despite these previous instructions, Harris did not comply with these rules by filing a formal objection to defendants' Concise Statement of Facts or his own Concise Statement of Facts in this case. However, in his motion for summary judgment, Harris pointed to specific facts and materials for the court to consider in response to the materials submitted by defendants. Despite his failure to comply with the rules, the court has evaluated the evidence in the record and determines the facts to be as follows:

Harris, SID # 14836157, is in the custody of ODOC and was housed at Snake River Correctional Institution ("SRCI"), Oregon State Correctional Institution ("OSCI"), and Oregon State Penitentiary ("OSP") at all times relevant to this suit. He was admitted to ODOC custody on

November 5, 2002. Declaration of Marylou Hazelwood ("Hazelwood Decl.") (docket #51), Ex. 2,

p. 1. Harris has a congenital degenerative condition that causes him significant back pain and

discomfort. Defendants' Concise Statement of Fact (docket #50) ("Defendants' Facts"); Ex. 2,

p.1. As evidenced by the medical records summarized below, Harris received medical care for his

condition, including treatment from outside neurologists and neurosurgeons, the OHSU pain

clinic, multiple MRIs and other diagnostic tests, pain medication, and accommodations.

Hazelwood Decl., Ex. 2.[1] However, this treatment has neither eliminated Harris' chronic pain nor

other uncomfortable, unpleasant symptoms of his condition. Defendants' Facts, Ex. 2, p. 2.

Shortly after entering ODOC custody in November 2002, Harris began taking Naprosyn

and Percogestic for chronic musculo-skeletal pain affecting his knees, neck, and back.

Declaration of Nanette Townsend ("Townsend Decl.") (docket #52); Ex. 1, Part J, p. 5.

In April 2003, Harris began complaining that his back was "really hurting." *Id*, p. 7. In

response to these complaints, ODOC staff scheduled an appointment with Ian Duncan, M.D., and

authorized restrictions such as a lower bunk, lower tier, no work or activities, and a wheelchair

taxi to the cafeteria. *Id*, p. 8. By the end of the month, Harris had improved but still experienced

stiffness in his joints. *Id.* He returned to his usual activities and continued with his pain

medication regiment. *Id.*

By August 2003, Harris reported that he continued to "experience pain and stiffness in

multiple joints – most notably in his lower back and both knees," with his medication helping

"some." *Id*, p. 9. In response, Dr. Duncan continued pain medication and conducted an x-ray of

---

[1] This exhibit is a chronological summary of Harris' medical treatment prepared by a Certified Legal Nurse Consultant based on the medical records attached to the Townsend Declaration. Although a handy reference tool, the court will cite to the relevant medical records.

the lumbar spine and both knees which revealed severe degenerative disc disease and possible severe degenerative arthritis. *Id*, p. 11; Part D, p. 17.

Throughout the fall and winter of 2003, Harris continued to report pain in his right side and left foot and received pain management therapy. *Id*, Part J, p. 10. Although he reported decreased back pain in November while taking a Medrol packet, he experienced "adverse mental effects, which he prefers to avoid." *Id*, pp. 2, 10. The Therapeutic Level of Care ("TLC") Committee approved an MRI on December 24, 2003. *Id*, Part H, pp. 20-21; Part J, p. 10. By January 2004, Harris reported that his back pain had moved into both lower extremities, making ambulation very difficult and again requiring a wheelchair taxi. *Id*, Part J, p. 12.

On January 16, 2004, a lumbar MRI showed 3mm retrolisthesis of L4 upon L5 and 5 mm anterolisthesis of L5 upon S1, which were felt to be related to degenerative changes. *Id*, Part D, pp. 15-16. Disc protrusions were noted, but no evidence of acute compression was found. *Id*.

Shortly thereafter, on January 21, 2004, the TLC Committee approved a referral to Dr. Dahlin for an evaluation and consultation concerning the treatment plan for Harris' back pain. *Id*, Part H, p. 19; Part J, p. 12. At that time, Harris reported that the pain required him to spend most of his time lying down, and his back brace proved ineffective. *Id*, Part J, p. 12. During his examination of Harris in May 2004, Dr. Dahlin noted that Harris had a 13-year history of right sciatica, and recommended that the MRI be reviewed by a spinal surgeon. *Id*, p. 14. In June, the TLC Committee approved the surgical consult. *Id*, Part H, p. 18.

Throughout 2004, Harris continued to report back pain and received work and wheelchair accommodations, as well as pain medication, including Vicodin to manage nighttime pains. *Id*, Part I, pp. 24-30.

5 - FINDINGS AND RECOMMENDATIONS

In July 2004, Harris reported exacerbated lower back pain and incontinence of the bowel and bladder intermittently over the previous six weeks. *Id*, Part H, p. 17. After being transferred to OSCI, Harris received another MRI on July 30 which showed moderate degenerative disc disease at T12-L1, from L4 to S1, with mild degenerative changes at L3-L4. *Id*, p. 9. Throughout the summer and early fall, Harris continued to complain of pain on his right side and had weekly contact with OSCI medical professionals to adjust medications, receive accommodations, and obtain treatment for unrelated injuries. *Id*, Part J, pp. 11-23.

On October 18, 2004, Maurice Collada, M.D., an outside neurosurgeon, examined Harris. *Id*, Part H, pp. 6-8. While Dr. Collada thought a neurology evaluation might be helpful, he found no evidence of nerve compression to explain Harris' profound limitations or other evidence to suggest that neurosurgery would provide any benefit. *Id.*

On November 26, 2004, a lumbar myelogram showed degenerative changes at the L4-5 disc, and L5-S1, but no nerve compression. *Id*, Part D, p. 18. The post myelogram CT showed the same results. *Id*, p. 19.

Michael Puerini, M.D., discussed the findings of the myelogram with Harris on January 7, 2005, and recommended strengthening exercises. *Id*, Part J, p. 25. Harris was "disappointed that the testing is normal and convinced something is horribly wrong." *Id.* Several weeks later, Harris requested a wheelchair in the unit because he "can't walk without it." *Id*, p. 26.

On January 28, 2005, Michael L. Wynn, D.O., an outside neurologist, evaluated Harris. *Id*, Part G, pp. 28-29. Harris provided Dr. Wynn with his complete medical history and underwent a full motor examination. *Id.* Dr. Wynn detected no overt nerve compression but recommended an EMG of Harris' legs to "help convince him that he indeed does not have any

nerve damage." *Id*, p. 29. If the EMG was negative, he recommended another MRI of the thoracic spine. *Id*.

On February 7, 2005, Dr. Collada examined Harris again, found no evidence of nerve root compression, and noted that Harris had made some gains. *Id*, p. 21. Dr. Collada emphasized managing the pain by avoiding bending, twisting, or lifting, or by use of a back brace. *Id*. He did not see any need for "aggressive surgical intervention," but recommended that a bone scan or injections might be helpful in the future to determine if Harris would be a possible candidate for fusion surgery at a later date. *Id*.

Harris had an EMG on March 11, 2005, which resulted in a "borderline study" with "possible but unlikely myopathy." *Id*, pp. 19-20. At that time, Dr. Wynn recommended that a thoracic MRI be performed and, if normal, "no further neurological work up needed," as Harris' "symptoms [are] more consistent with functional disorder." *Id*, p. 20.

On March 28, 2005, the thoracic MRI revealed an "essentially normal MRI examination of the spinal cord" with "no focal lesions, enlargement, or discrete abnormalities identified." *Id*, Part D, p. 14. There were spondylosis changes with disc dessication and annular disc bulges at T2-3, T7-8, and T12-L1 that "appear similar to the prior examination dated 7-30-04." *Id*.

On April 14, 2005, Harris returned to SRCI where he was provided a wheelchair for distances greater than 25 meters, use of a cane, continued pain medication, and placed on a low bunk, no stairs restriction. *Id*, Part I, p. 22. During this time, Dr. Duncan reported that Harris was doing well, resumed walking, was exercising daily, and was determined to remain ambulatory. *Id*, Part K, pp. 1-2.

7 - FINDINGS AND RECOMMENDATIONS

During a chart review and back examination on February 28, 2006, Gayle Schantzen, M.D., agreed with Dr. Wynn's earlier assessment that Harris most likely suffered from some sort of myofascial pain, though only one trigger point was identified. *Id*, Part C, p. 8. She recommended back exercises and continued pain medication and authorized the use of a wheelchair for long distances. *Id*.

Throughout the spring of 2006, Harris continued to report varying pain intensity in his legs and back. *Id*. He continued to see Dr. Schantzen and receive pain medication, including a trial of Tegretol which seemed to help at first, but then decreased in effectiveness. *Id*, pp. 8-11. Dr. Schantzen provided Harris a full set of back exercises to perform daily in his cell and recommended a single physical therapy consultation to add exercises to his routine. *Id*, p. 8. The TLC Committee did not approve the physical therapy consultation. *Id*.

During a visit with Dr. Schantzen on June 27, 2006, Harris reported extreme back pain, preventing him from sitting in a chair in the inmate dining hall and requiring him to squat in front of the table and brace himself with his arms due to numbness in his legs. *Id*, p. 11. Harris also reported blackened toenails, blood in his stool, and leaking urine and stool after prolonged sitting. *Id*. Dr. Schantzen ordered hemoccults and possible aroscopy to address the blood in the stool, recommended ice packs for the back pain, and changed the pain medication to Neurontin to replace the Tegretol. *Id*. At a follow-up visit about a month later, Harris reported that the blood in his stool had stopped and that the ice and Neurontin were helpful. *Id*, p. 12.

On July 28, 2006, x-rays of the lumbar spine revealed no significant change from the 2003 exam. *Id*, Part P, p. 22. Between July 2006 and February 2007, Harris had several infirmary stays related to back pain and for an elbow wound. *Id*, Part C, pp. 1-5, 12-19. Harris continued to

receive pain medication treatment with modifications when needed. *Id.* On August 8, 2006, the

TLC Committee determined that the ice packs, Neurontin, and x-ray review were not medically

necessary. *Id*, p. 13.

In January 2007, Harris reported that back pain prevented him from sitting for long periods

of time, causing him to experience difficulty in walking and preventing him from getting to the

inmate dining room in time to eat. *Id*, p. 19. Harris was housed in the infirmary January 14-17

for back pain, range of motion problems, and inability to start a urine stream. *Id*, pp. 3-5. After

some transportation issues, he was transferred from SRCI to OSCI. *Id*, p. 5.

Upon arrival at OSCI in February 2007, Harris reported an inability to walk to the inmate

dining room due to pain and missed nine meals. *Id*, p. 2. He was admitted to the infirmary on

February 12, where he remained until April 8, 2007. *Id*, pp. 1-2; Part B, pp. 25-27

On February 21, 2007, the TLC Committee approved a consultation with Steven Asher,

M.D., an outside neurologist. *Id*, Part G, p. 8. Dr. Asher examined Harris on April 6, 2007, but

found no good explanation for his pain based on the lack of clear radicular elements or findings.

*Id*, pp. 22-23. Dr. Asher opined that Harris may be "elaborating" his pain, noted that he had been

"very adequately studied," and was unsure whether further studies would be helpful. *Id*, p. 23.

Nonetheless, he recommended a lumbar spine MRI which the TLC Committee approved on

April 11, 2007. *Id*, Part B, p. 27; Part G, p. 9. Because of the transport problems experienced in

January 2007, medical staff made detailed arrangements for Harris' transport to the MRI in a

reclining wheelchair to address his difficulty walking and sitting. *Id*, Part B, p. 24. Harris was

"very satisfied with the plan." *Id.*

On May 4, 2007, an MRI of Harris' lumbar spine showed multilevel degenerative disc disease with diffuse bulging of the disc annulus, as well as pronounced anterolisthesis of L5 relative to S1. *Id*, Part F, p. 18. Additionally, there were hypertrophic changes within the lower lumbar facet joints and advanced bilateral foraminal narrowing at L5-S1, but the central canal looked to be adequate in size. *Id*.

At the end of May, the TLC Committee another consultation with an outside neurosurgeon. *Id*, Part B, p. 23. At an appointment on May 31, 2007, J. Elliott Blakeslee, M.D., discussed the referral to the neurosurgeon and noted Harris' complaints of pain in his low back, with tenderness in the L4 to S1 area. *Id*. During the physical exam, Harris could only do a knee-bend halfway to a squat, but could flex his hips and bend his knees when lying down. *Id*. Harris continued with pain medication and sack lunches because he could not get to the inmate dining room in time to eat. *Id*, p. 22.

Kenneth Little, M.D., an outside neurosurgeon from Boise, Idaho, saw Harris on July 6, 2007, and recommended surgical intervention with decompression and fusion at L4-S1 to help with the pain. *Id*, Part F, pp. 28-29. The TLC Committee recommended that a second opinion be sought from Dr. Collada. *Id*, p. 27; Part B, p. 22. When speaking with Dr. Blakeslee about his findings, Dr. Little indicated that he believed Harris had a lot of "psychological overlays" which may account for his symptoms. *Id*, Part B, p. 21. Furthermore, Dr. Little indicated that he thought surgery might help with the pain but doubted that it would help with Harris' walking. *Id*. After hearing this, Harris wished to proceed with a second opinion from Dr. Collada. *Id*.

Prior to seeing Harris, Dr. Collada requested a bone scan which the TLC Committee approved on September 26, 2007. *Id*, pp. 21-22; Part F, p. 26. On October 15, 2007, a lumbar

bone scan showed foci of increased uptake in the lower lumbar spine corresponding to degenerative disc disease and facet arthropathy on the May 4 lumbar MRI. *Id*, Part F, p. 15.

On October 19, 2007, the TLC Committee also approved a CT scan of Harris' pelvis. *Id*, p. 20. That CT scan was performed on November 14, 2007, and showed mild grade I anterior spondylolisthesis at L4-S1, moderate narrowing at L4-4 and L5-S1, and degenerative disc changes. *Id*, pp. 7-8. Shortly thereafter, Harris was admitted to the infirmary for back pain and difficulty with activities of daily living and remained there on bed rest and pain medication until February 6, 2008. *Id*, Part B, pp. 3, 5-17.

During his examination of Harris on November 28, 2007, Dr. Collada noted that Harris expressed pain with every movement and resisted during the exam, and that the examination was "fairly useless." *Id*, Part F, p. 10. Dr. Collada observed that Harris had "variable weakness" and "magnification of symptoms [was] apparent." *Id*. He recommended a psychological evaluation, facet steroid injections, and continued NSAID pain medication therapy. *Id*.

On February 19, 2008, after his release from the infirmary, Harris reported to John Vargo, M.D., that he was "overall better," he had "less nerve pain," his "feet don't feel burned off," and he was "as good as he likes to be." *Id*, Part B, p. 3. Dr. Vargo observed that Harris was ambulating pretty well with a cane. *Id*. Throughout 2008, Harris continued to have his chart reviewed and his medications renewed on a regular basis. *Id*, pp. 1-4.

In July 2008, the TLC Committee approved a facet injection recommended by Dr. Collada to see if Harris would receive any benefit or had too much of a "functional overlay." *Id*, p. 1; Part F, p. 5. On September 19, 2008, the referral to Salem Pain Clinic for the injection was not

completed because of their refusal to see inmates. *Id*, Part B, p. 1. Therefore, on November 13, 2008, the TLC Committee approved a consultation at OHSU. *Id*, Part F, p. 3.

In December 2008, Harris complained of stool incontinence, one to two times per week for the previous five years. *Id*, Part A-2, p. 18. Harris was scheduled for a chronic back pain exam at OHSU. *Id*.

After Harris' visit to the OHSU Comprehensive Pain Center on January 2, 2009, Gary Lienhart, D.O., recommended a multidisciplinary treatment plan. *Id*, Part E, pp. 26-30. Specifically, he recommended increasing the Gabapentin dosage with a possible trial of Pregabalin. *Id*, p. 29. Additionally, Dr. Lienhart recommended significantly decreasing the Naprosyn dosage to avoid the negative side effects Harris experienced and suggested using the Flector patch instead. *Id*. Finally, he recommended aggressive physical therapy focusing on lumbar stabilization, stretching, and strengthening, and a surgical consultation if not already done. *Id*, pp. 29-30.

The last medical record from defendants is dated January 8, 2009, and indicates that medical staff discussed the OHSU consult with Harris, but the report had not yet arrived. *Id*, Part A-2, p. 17. Harris has submitted an MRI report dated May 8, 2009, which indicated annular bulges in several areas, bilateral L5 and L4 neural foraminal narrowing around the exiting L5 nerve roots, and anterolisthesis of L5 on S1 associated with marked hypertrophy of the facet joints and sclerosis at the L5 pars interarticularis regions. Plaintiff's Motion for Summary Judgment, (docket #57), Ex. 2, pp. 3-4. According to a later filing with the court, Harris indicates that he had back surgery on September 16, 2009. Plaintiff's Motion for Update (docket #63), p. 1.

At defendants' request, Donald R. Olson, M.D., reviewed Harris' medical records and all documents filed with the court and made several observations about Harris' medical condition and the care received while in ODOC custody. Defendants' Facts, Ex. 2.[2] Dr. Olson concluded that Harris suffers from a "congenital condition clearly present since birth but now progressive" that has caused Harris "significant problems with multiple level degenerative changes . . . which has ended in a chronic pain syndrome," for which treatment over the years has not been totally successful. *Id*, p. 1. Finding that the "medical management and treatment of [Harris] has been appropriate, reasonable, and necessary," Dr. Olson noted that Harris has been "worked up extensively" and has been given "multiple medications" for treatment of his chronic pain. *Id*, pp. 2-3. Dr. Olson agreed with Dr. Lienhart's January 2009 report outlining Harris' symptoms, diagnosis, and treatment. *Id*, pp. 1-2. He recommended that a flexion/extension x-ray of the lumbar spine be performed to determine if there is excessive motion, and, if found, "a case could be made for a surgical fusion." *Id*, pp. 2-3. However, he questioned whether surgery would benefit Harris because of his "magnification of symptoms," and a "high risk of making the situation worse with neuropathic pain already present." *Id*, p. 3.

## FINDINGS

Defendants seek summary judgment on all claims because Harris has received appropriate evaluation and treatment and defendants have not been deliberately indifferent to his serious medical needs. Additionally, they seek summary judgment as to defendant Myers because he was not directly responsible for providing Harris with medical care. Presumably, Harris seeks

---

[2] An identical version of Dr. Olson's expert report is included as docket #47.

summary judgment on his deliberate indifference claims because the record is clear that he has not

been provided appropriate medical care.

## I. **Personal Involvement of Defendant Myers**

As a general rule, "liability under § 1983 must be based on the personal involvement of

the defendant." *Barren v. Harrington*, 152 F3d 1193, 1194 (9th Cir 1998). Accordingly, "state

officials are not subject to suit under § 1983 unless they play an affirmative part in the alleged

deprivation of constitutional rights." *King v. Atiyeh*, 814 F2d 565, 568 (9th Cir 1987). "A plaintiff

must allege facts, not simply conclusions, that show that an individual was personally involved in

the deprivation of his civil rights." *Barren*, 152 F3d at 1194. To prevail on an Eighth

Amendment claim, the plaintiff "must prove (1) that the specific [official], in acting or failing to

act, was deliberately indifferent to the mandates of the Eighth Amendment and (2) that this

indifference was the actual and proximate cause of the deprivation of the inmate's Eighth

Amendment right to be free from cruel and unusual punishment." *Leer v. Murphy*, 844 F2d 628,

634 (9th Cir 1988). In other words, in order to be liable, a defendant must be personally involved

and causally connected to the deprivation of the inmate's Eighth Amendment right.

Harris alleges that Myers, the former Attorney General of Oregon, was personally

involved in the alleged deprivations of his rights because he "and/or personnel . . . knowingly and

willingly forced Dr. Shantzen to sign an affidavit that was used to deny plaintiff of proper and

needed medical care [for] his serious medical condition." Amended Complaint, p. 4. As relief,

Harris seeks a "federal investigation into the alleged involvement of the Oregon Attorney General

office as it pertains to the affidavit signed by Dr. Schantzen against her will." *Id*, p 7. However,

with the exception of that allegation, Harris does not otherwise provide any evidence of this

14 - FINDINGS AND RECOMMENDATIONS

allegedly false affidavit.  Though Harris refers to a letter from Dr. Shantzen in his motion for

summary judgment and appears to have made an effort to depose her as an expert, no letter,

statement, or affidavit signed by Dr. Shantzen appears anywhere in the record.  Her name does

appear as a treating physician in Harris' medical records, but nothing in the record supports

Harris' allegations that Myers or anyone else forced her to sign an affidavit relating to his medical

care.  Accordingly, Myers should be granted summary judgment on Harris' claims.

## II. Denial of Adequate Medical Care

Harris alleges that defendants neglected his serious medical condition by denying proper

medical care and by failing to pursue options that would alleviate his back pain.  As relief, Harris

primarily seeks "immediate proper medical care as indicated by Dr. Kenneth Little and supporting

test results," and a "determination of disability level after proper medical care and patient is

stable."  *Id*, p. 7.  Presumably, the "immediate proper medical care" sought by Harris is the back

surgery recommended by Dr. Little after examining Harris in July 2007.

In order to state a cognizable claim for inadequate medical care, a prisoner must allege

"acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical

needs."  *Wood v. Housewright*, 900 F2d 1332, 1334 (9th Cir 1990), citing *Estelle v. Gamble*, 429

US 97, 106 (1976).  Deliberate indifference requires proof that the state "knows that inmates face

a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to

abate it."  *Farmer v. Brennan*, 511 US 825, 847 (1994).  This indifference "must be substantial,"

and "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of

action."  *Broughton v. Cutter Labs.*, 622 F2d 458, 460 (9th Cir 1980), citing *Estelle*, 429 US at

105-06.

"A difference of opinion does not amount to a deliberate indifference to [a prisoner's]

serious medical needs." *Sanchez v. Vild*, 891 F2d 240, 242 (9th Cir 1989).  To establish that a

difference of medical opinion over appropriate medical treatment amounted to deliberate

indifference, the prisoner "must show that the course of treatment the doctors chose was medically

unacceptable under the circumstances" and "that they chose this course in conscious disregard of

an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F3d 330, 332 (9th Cir 1996)

(citations omitted).  Furthermore, a difference of opinion between the physician and the prisoner

concerning the appropriate course of treatment does not support a claim under § 1983.  *See*

*Toguchi v. Chung*, 391 F3d 1051, 1058 (9th Cir 2004); *Franklin v. Or., State Welfare Div.*, 662

F2d 1337, 1344 (9th Cir 1981).  A "mere delay of surgery, without more, is insufficient to state a

claim of deliberate medical indifference." *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F2d

404, 407 (9th Cir 1985).  Finally, there is no claim for deliberate medical indifference unless the

delay was harmful.  *Id.*

Most of Harris' complaints reflect his disagreement with diagnoses or the importance and

timing of various tests and procedures.  Most significantly, Harris contends that he did not receive

surgery in a timely manner since it did not occur until September 2009, more than two years after

Dr. Little's recommendation in July 2007.  In response, defendants have provided expert

testimony from Dr. Olson, who concluded that the treatment provided to Harris since 2002 for his

chronic pain has been appropriate and reasonable, and that while surgery might be helpful, there

also existed a risk that Harris' pain may be made worse by surgical intervention.  Rather than

presenting an expert witness to challenge Dr. Olson's testimony, Harris presents only his own

opinion, interpretations and medical conclusions about his condition.  To challenge Dr. Olson's

opinion, Harris identifies portions of Dr. Olson's statement and corresponding portions of his

medical records that he believes are inconsistent and offers his own interpretation of those

medical records.  Plaintiff's Motion for Summary Judgment, Ex. 1, p. 3-8.  However, these

objections and interpretations amount only to a difference of opinion between an inmate and a

physician and, without competent supporting evidence, are insufficient to challenge Dr. Olson's

expert opinion.  Accordingly, Dr. Olson's expert statement will be considered in its entirety by the

court.

        In further support of his position, Harris attempts to offer several purported statements by

ODOC medical professionals and other non-parties, none of which appears in the record other

than through Harris' own recollection.  *Id*, pp. 3-10.  Harris specifically refers to "conversations

with Charles Simmons, [a] letter from Dr. Schantzens [*sic*], and numerous notes from plaintiff's

daily journal" as evidence supporting his motion for summary judgment.  *Id*, p. 1.  In considering

a summary judgment motion, only admissible evidence may be considered.  FRCP 56(e); *Beyene

v. Coleman Sec. Servs., Inc.*, 854 F2d 1179, 1181 (9th Cir 1988).  The Ninth Circuit "[has]

repeatedly held that unauthenticated documents cannot be considered in a motion for summary

judgment." *Orr v. Bank of America, NT & SA*, 285 F3d 764, 773 (9th Cir 2002) (citations

omitted).  The record contains no information regarding conversations with Charles Simmons or

any letter from Dr. Schantzen.

        The journal excerpts provided by Harris attempt to document interactions with Garth

Gulick, M.D., in order to show that Dr. Gulick and other ODOC staff were deliberately denying

him needed treatment.  Plaintiff's Motion for Summary Judgment, Ex. 2, pp. 6-11, 13-14.

However, the journal does not otherwise lay an adequate foundation for Dr. Gulick's purported

statements, but rather reflects only Harris' recollection of a purported interaction with him. Nor do the journal excerpts have any of the guarantees of trustworthiness required by Rules of Evidence. *See Fong v. American Airlines, Inc.*, 626 F2d 759, 763 (9th Cir 1980). Instead, the statements directly contradict the information in the medical records, are plainly self-serving, and have no corroboration.

Furthermore, Harris has failed to lay a foundation for any exception to the hearsay rule to overcome defendants' objections to these purported statements. The statements offered by Harris are inadmissible hearsay as out-of-court statements offered to prove the truth of the matter asserted, namely that defendants knew of and consciously disregarded a risk to his serious medical needs. Therefore, Harris' own interpretation of the medical records or his account of conversations he purportedly had with various ODOC medical professionals is inadmissible hearsay and will not be considered by the court.

Nothing in the record before the court suggests that Harris' medical condition required a different level of care than he received. Defendants monitored Harris' medical condition regularly and provided appropriate and adequate care in response to his medical needs. While in ODOC custody, Harris has received extensive objective testing, including numerous x-rays, MRIs, a myelogram, a bone scan, an electromyogram, and a CT scan. All the objective tests show that he suffers from a degenerative disc condition. In addition, all the neurologists and neurosurgeons outside ODOC who physically examined Harris and reviewed his medical records came to the same medical conclusion, namely that Harris suffers from a degenerative disc condition that causes him severe pain.

Harris believes that defendants are aware that his condition is far worse than they will admit and are deliberately refusing to provide appropriate treatment in order to cause him unnecessary pain and suffering.  However, the record belies that belief.  Despite extensive objective testing and examinations, no organic cause can be found to explain Harris' symptoms, leading several doctors to opine that his severe pain symptoms may be related to a functional disorder or are exaggerated.  Townsend Decl., Part G, pp. 19-20, 23; Part B, pp. 21-22.  Given the inability to pinpoint an organic cause for Harris' symptoms, the treatment recommendations have sometimes differed.  However, all the treating and examining medical professionals have expressed doubt as to the effectiveness of surgical intervention and recommended conservative treatment with exercise and medication for pain management.  *Id*, Part G, pp. 21, 23, 28-29; Part H, pp. 6-8; Part J, p. 12.

There is no evidence in the record that Harris was ever denied the treatment recommended by various professionals.  Harris received modifications in his pain medication when requested, was admitted to the infirmary on several occasions, was provided with accommodations when his pain was so severe that movement was especially difficult, was seen regularly by ODOC medical staff for chart reviews, was provided updates on appointment scheduling, and was provided access to outside specialists.  Furthermore, Harris' medical record is replete with medical kites documenting his communications with various ODOC medical professionals and demonstrating that defendants repeatedly provided medical staff to see him when he requested attention.  *Id*, Parts N-Q.  Finally, by Harris' own admission, he recently had back surgery, which virtually every physician who examined him considered as a last resort.

Reviewing the entire record, no reasonable fact-finder could conclude that defendants were deliberately indifferent to Harris' serious medical needs in violation of his Eighth Amendment rights. Harris no doubt suffers from a degenerative condition that causes him severe pain, but he has filed to provide a genuine issue of material fact in regard to his treatment and to submit competent evidence to rebut defendants' expert testimony. To the contrary, the record reflects that Harris received medical care and attention virtually every time he requested it and that at no time did any of the defendants fail to provide treatment that was recommended. Rather, defendants continued to order tests, refer Harris to outside specialists, authorize modifications in his pain management medications, and provide accommodations as necessary. There is no evidence that Harris' medical needs were ignored. Harris' disagreement with defendants' assessment and treatment of his condition is insufficient to support a claim under § 1983.

Because no genuine issues as to any material fact remain, summary judgment should be entered in favor of defendants, and this case should be dismissed with prejudice.

## RECOMMENDATION

For the reasons discussed above, defendants' motion for summary judgment (docket #48) should be GRANTED, and Harris' motion (docket #57) should be DENIED. Accordingly, judgment should be entered dismissing this case with prejudice.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **November 30, 2009**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

20 - FINDINGS AND RECOMMENDATIONS

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

### NOTICE

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED this 6th day of November, 2009.

Janice M. Stewart
United States Magistrate Judge